# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **DAVID A. RATLIFF,** )<br>Plaintiff )<br> )<br>v. )<br> )<br> )<br> )<br>**JO ANNE B. BARNHART**, )<br>**Commissioner of Social Security,** )<br>Defendant ) | | Civil Action No. 1:05cv00084<br>**MEMORANDUM OPINION**<br><br><br><br><br>By:  PAMELA MEADE SARGENT<br>United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, David A. Ratliff, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ratliff filed his application for DIB on or about July 25, 2003,[1] alleging disability as of October 24, 2002,[2] based on arthritis, numbness on the left side of his leg and foot, seizures, intestinal problems, left leg and foot pain and depression. (Record, ("R."), 92-94, 98, 151, 166.) Ratliff's claim was denied both initially and on reconsideration. (R. at 73-75, 78, 80-82.) Ratliff then requested a hearing before an ALJ. (R. at 83.) The ALJ held a hearing on November 5, 2004, at which Ratliff was represented by counsel. (R. at 31-64.)

By decision dated November 30, 2004, the ALJ denied Ratliff's claim. (R. at 18-24.) The ALJ found that Ratliff met the disability insured status requirements of

---

[1]Ratliff protectively filed a previous application for DIB on October 28, 2002, alleging that he became disabled on the same onset date, October 24, 2002. (R. at 18, 89-91.) Ratliff's claim was denied on April 11, 2003. (R. at 34, 68-72.) The administrative law judge, ("ALJ"), determined that there was no basis for reopening the prior determination and that *res judicata* applied to the period on or prior to October 28, 2002. (R. at 19.)

[2]Given the ALJ's previous finding that *res judicata* applies to the period on or prior to October 28, 2002, the relevant time period currently before the court for determining disability runs from October 29, 2002, through November 30, 2004, the date of the ALJ's most recent decision.

-2-

the Act for DIB purposes through the date of the decision. (R. at 23.) The ALJ found that Ratliff had not engaged in substantial gainful activity since October 24, 2002. (R. at 23.) The ALJ found that the medical evidence established that Ratliff had severe impairments, namely a seizure disorder, hypertension and chronic neuritis of the intercostal nerves,[3] but found that Ratliff did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ further found that Ratliff's allegations regarding his limitations were not totally credible. (R. at 23.) The ALJ found that Ratliff had the residual functional capacity to perform medium work[4] that did not require climbing or hazardous work. (R. at 23.) Thus, the ALJ found that Ratliff could not perform any of his past relevant work. (R. at 23.) Based on Ratliff's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Ratliff could perform jobs existing in significant numbers in the national economy, including those of an assembler and a car cleaner. (R. at 23.) Therefore, the ALJ found that Ratliff was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his opinion, Ratliff pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 5-7.) Ratliff then filed this action seeking review of the ALJ's unfavorable decision, which now stands

---

[3]The ALJ does not specifically state in his decision what Ratliff's severe impairments are. However, it appears from his discussion of the medical evidence that he deemed the combination of the aforementioned impairments to be severe.

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2006).

as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on Ratliff's motion for summary judgment filed February 3, 2006, and the Commissioner's motion for summary judgment filed March 7, 2006.

## *II. Facts*

Ratliff was born in 1976, (R. at 33, 89), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and two years of college education. (R. at 33.) Ratliff has past relevant work experience as a clerk, a cook, a cashier, a salesman and a manager. (R. at 112, 134.)

At his hearing, Ratliff testified that he sustained injuries to his left lower leg following a motorcycle accident in 1999. (R. at 40.) He stated that he also fractured his left ribs as a result of the accident. (R. at 41.) He stated that he suffered from chronic pain and arthritis as a result of the injury. (R. at 41.) Ratliff stated that he had been involved in five motor vehicle accidents, which resulted in five concussions. (R. at 44.) He stated that he took medication for a seizure disorder. (R. at 46.) Ratliff stated that he began experiencing panic attacks, depression and anxiety following his 1999 accident. (R. at 49.)

Bill Ellis, a vocational expert, also was present and testified at Ratliff's hearing. (R. at 58-63.) Ellis was asked to consider a hypothetical individual of Ratliff's age, education and work experience, who was limited as indicated by the assessment of Dr. Randall Hays, M.D., a state agency physician. (R. at 58-59, 418-25.) Ellis testified that such an individual could perform jobs at the medium exertion level that existed in significant numbers in the national economy, including those of an assembler and

Case 1:05-cv-00084-PMS   Document 15   Filed 07/17/06   Page 4 of 18   Pageid#: 55

a car cleaner. (R. at 59.) Ellis also identified jobs at the light[5] exertion level that did not require working around hazardous machinery that such an individual could perform, including jobs as an assembler, a production inspector and a hand packer. (R. at 60.) He also identified jobs at the sedentary[6] level that such an individual could perform, including jobs as a sorter, an office clerk and an order clerk. (R. at 60.) Ellis testified that if the individual was limited as indicated by Belinda G. Overstreet, Ph.D., a licensed clinical psychologist, there would be no jobs available. (R. at 61, 469-70.)

In rendering his decision, the ALJ reviewed records from Smyth County Community Hospital; Johnston Memorial Hospital; Dr. Larry G. Lipscomb, M.D.; Abingdon Center; Dr. Lyle W. Bauman, M.D.; University of Virginia Health System; Dr. Gerard H. Murphy, M.D.; Dr. Jacinto Alvarado, M.D.; Dr. Deborah Weddington, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Howard Leizer, Ph.D., a state agency psychologist; Dr. Randall Hays, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Mount Rogers Community Counseling Services; and Belinda G. Overstreet, Ph.D., a licensed clinical psychologist.[7]

---

[5]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. § 404.1567(a) (2006).

[7]The record contains medical reports from Dr. Samuel D. Vernon, M.D., which pertain to a David J. Ratliff, but do not appear to pertain to the claimant in this case. (R. at 173-77.)

Case 1:05-cv-00084-PMS   Document 15   Filed 07/17/06   Page 5 of 18   Pageid#: 56

The record shows that Ratliff had numerous visits[8] to the emergency room at Smyth County Community Hospital primarily for injuries sustained from motor vehicle accidents. (R. at 179-268.) In July 1999, a CT scan of Ratliff's left foot showed a fracture. (R. at 245-49.) In August 2000, x-rays of Ratliff's left shoulder were normal. (R. at 241.) X-rays of his thoracic spine showed a minimal compression fracture of the T5 vertebrae, and an x-ray of his cervical spine showed possible cervical spasm. (R. at 241.) In November 2000, Ratliff complained of chest pain. (R. at 229-35.) A chest x-ray was normal. (R. at 235.) In May 2001 and June 2001, Ratliff complained of abdominal pain. (R. at 212-16.) Examination was unremarkable as well as a CT of Ratliff's abdomen. (R. at 214, 216.)

The record shows that Ratliff was seen at the emergency room at Johnston Memorial Hospital on five occasions from December 1998 through August 2002. (R. at 269-301.) In June 1999, Ratliff complained of pain to his left leg and foot as a result of a motor vehicle accident. (R. at 289-95.) X-rays of Ratliff's scapula, cervical spine, chest, thoracic spine, left lower leg, left ankle, left foot and right shoulder were normal. (R. at 290-92.) An x-ray of Ratliff's clavicle showed an old healed fracture through the mid shaft, but no fracture. (R. at 292.) A CT scan of Ratliff's head also was normal. (R. at 293.) In July 2002, Ratliff reported that he had a seizure and that he had not taken his Klonopin for the previous week. (R. at 275-83.)

The record shows that Ratliff received treatment from Dr. Larry G. Lipscomb, M.D., from February 1999 through August 1999 for shoulder, leg and foot pain. (R.

---

[8]The record shows that Ratliff had 22 emergency room visits from June 1996 through June 2001.

-6-

at 303-11.) Dr. Lipscomb released Ratliff to return to work on August 30, 1999. (R. at 303.) He reported that he could find no reason to justify Ratliff not being able to work. (R. at 303.) He did not place any restrictions on Ratliff's work-related abilities.

Ratliff sought treatment from the Abingdon Center from July 2000 through January 2001 for his complaints of anxiety and depression. (R. at 327-41.) On July 28, 2000, Ratliff reported that he was unable to cope with past issues. (R. at 337-41.) He also reported anxiety. (R. at 338.) Patricia Owens, L.P.C., reported that Ratliff's affect and mood were anxious. (R. at 339.) Owens diagnosed generalized anxiety disorder and major depressive disorder, single episode, moderate. (R. at 340.) She assessed Ratliff's then-current Global Assessment of Functioning, ("GAF"), score at $60^9$ with his score being $65^{10}$ in the previous year. (R. at 340.) On September 13, 2000, Dr. Richard C. Haaser, M.D., saw Ratliff for his complaints of insomnia. (R. at 334.) Dr. Haaser reported that Ratliff's speech was rapid with psychomotor activation. (R. at 334.) His mood was a mixture of euphoria, irritability and anxiety. (R. at 334.) Dr. Haaser diagnosed a mood disorder due to a closed head injury and a personality change due to closed head injury with manic-like features.[11] (R. at 334.) On October

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

[10]A GAF of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[11]On May 12, 1998, Ratliff reported that he hit his head in a motor vehicle accident. (R. at 256-62.) A CT scan of Ratliff's head was normal. (R. at 260.) He was diagnosed with a mild

-7-

12, 2000, Ratliff reported anxiety with rapid heartbeat and sweating. (R. at 333.) On November 8, 2000, Ratliff reported irritability and daily panic anxiety episodes with hyperventilation, sweating and tremors. (R. at 331.) On December 13, 2000, Dr. Haaser reported that Ratliff was better dressed and groomed. (R. at 330.) His affect was subdued. (R. at 330.) He had a depressive aspect overall. (R. at 330.) On January 30, 2001, Dr. Haaser reported that he had spoken with Owens who expressed concerns that Ratliff was abusing prescription medication. (R. at 327.) That day Ratliff's affect was bright with no evidence of anxiety or depression. (R. at 327.) It was noted that Ratliff had inconsistencies in the history that he provided, including denying a drug problem but later reporting that his mother had taken control of his medication because of her concern that he was misusing it. (R. at 327.) In January 2001, Ratliff was referred to Mount Rogers Community Counseling Services because he failed to participate in counseling with Owens. (R. at 441.)

On August 6, 2001, Ratliff was seen at the University of Virginia Health System for his complaints of left upper quadrant abdominal pain. (R. at 348-50.) No sensory deficits were noted, and Ratliff had normal motor strength in both the upper and lower extremities. (R. at 349.) Trigger points were noted along the left rib area. (R. at 349.) An injection was administered, and Ratliff reported immediate relief. (R. at 350.)

On October 3, 2001, Dr. Gerard H. Murphy, M.D., saw Ratliff for a follow-up visit concerning his complaints of depression and anxiety. (R. at 366-67.) Ratliff

---

concussion. (R. at 258.) On August 7, 2000, Ratliff was diagnosed with a minor head injury following a motor vehicle accident. (R. at 238.)

-8-

reported doing much better with his mood being less anxious. (R. at 367.) Dr. Murphy reported that Ratliff was "quite bright today, exhibits full range." (R. at 366.) On December 21, 2001, Ratliff reported that Klonopin was helping his anxiety symptoms. (R. at 363.) Ratliff reported leg pain, stating that he had hit his leg against a concrete planter. (R. at 363.) Dr. Murphy reported that Ratliff's leg did not seem to have obvious bruising, nor did it significantly bother him while walking. (R. at 362.) Dr. Murphy noted to be aware of drug-seeking behavior. (R. at 362.) On March 27, 2002, Ratliff reported good relief while taking Klonopin. (R. at 362.) On July 16, 2002, Ratliff reported that he had a seizure the previous day. (R. at 358-59.) He reported that he had not taken Klonopin in five days. (R. at 359.) He was diagnosed with a seizure and questionable Klonopin withdrawal. (R. at 358.) On August 29, 2002, Ratliff reported that his depression was stable on Zoloft. (R. at 356.) On November 6, 2002, Ratliff reported that his girlfriend had attacked him. (R. at 355.) He was diagnosed with a human bite and anxiety. (R. at 355.) He was advised that if he did not pay his bill, he would no longer be seen by Dr. Murphy. (R. at 354.)

On October 16, 2002, Dr. Deborah Weddington, M.D., saw Ratliff for his complaints of depression, anxiety and low back pain. (R. at 385.) Straight let raising tests were negative. (R. at 385.) His sensation and motor strength were within normal limits in both the upper and lower extremities. (R. at 385.) Dr. Weddington reported that she believed Ratliff was "doctor shopping." (R. at 385.) She informed Ratliff that she would not be willing to prescribe medication for chronic pain and offered a referral to a mental health clinic, which he declined. (R. at 385.)

On January 6, 2003, Dr. Jacinto Alvarado, M.D., saw Ratliff for his complaints

of depression, anxiety and seizures. (R. at 384.) Ratliff reported that his seizure disorder was controlled with medication. (R. at 384.) Dr. Alvarado encouraged Ratliff to go on with his life. (R. at 384.) On July 3, 2003, Ratliff requested something for anxiety. (R. at 377-78.) He was diagnosed with hypertension, not adequately controlled, insomnia, anxiety, depression and headaches. (R. at 377.) On July 19, 2003, Ratliff reported that he stopped taking all of his medications because he had too many to keep up with. (R. at 375.) He then reported that he had placed his medications in an ice tray to keep track of them, but put the ice tray in the freezer, which ruined the medications. (R. at 375.) It was reported that Ratliff was in no acute distress and did not appear anxious. (R. at 375.) On September 5, 2003, Ratliff was seen for an acute episode of bronchitis with chest pain. (R. at 372.) Dr. Alvarado reported that Ratliff's chest was clear and it seemed that Ratliff was making his complaints sound more severe in an attempt to obtain narcotics. (R. at 372.) On September 22, 2003, Ratliff again reported that his medication controlled his seizure disorder. (R. at 371.) On October 3, 2003, Dr. Alvarado reported that Ratliff wanted narcotics, but he did not prescribe any. (R. at 370.)

On January 30, 2004, Ratliff saw Dr. Weddington for complaints of left leg pain and depression. (R. at 459.) She diagnosed chronic left leg pain, depression and an anxiety disorder. (R. at 459.) She recommended that Ratliff follow-up with Dr. Alvarado for referral to a pain clinic and that he follow-up with Mount Rogers Community Counseling Services for his complaints of depression and anxiety. (R. at 459.)

On June 30, 2004, Ratliff complained of pain in his left groin and left knee. (R.

-10-

Case 1:05-cv-00084-PMS   Document 15   Filed 07/17/06   Page 10 of 18   Pageid#: 61

at 446.) Dr. Alvarado reported that he did not believe that Ratliff had significant pain that would interfere with his regular activities. (R. at 446.) Dr. Alvarado reported that he believed that Ratliff exaggerated his symptoms in an attempt to receive extra narcotics. (R. at 446.)

On April 9, 2003, Dr. Richard M. Surrusco, M.D., a state agency physician, indicated that Ratliff had the residual functional capacity to perform medium work. (R. at 394-402.) He indicated that Ratliff could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 397.) Dr. Surrusco reported that Ratliff should never climb ladders, ropes or scaffolds. (R. at 397.) No manipulative, visual or communicative limitations were noted. (R. at 398-99.) He indicated that Ratliff should avoid moderate exposure to hazards. (R. at 399.)

On April 9, 2003, Howard Leizer, Ph.D., a state agency psychologist, indicated that Ratliff had no medically determinable impairment. (R. at 403-17.) He indicated that Ratliff engaged in ordinary activities and had not been treated by a mental health professional. (R. at 417.) He reported that there was no evidence of a severe psychiatric impairment. (R. at 417.)

On October 17, 2003, Dr. Randall Hays, M.D., a state agency physician, indicated that Ratliff had the residual functional capacity to perform medium work. (R. at 418-25.) He indicated that Ratliff could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 421.) Dr. Hays reported that Ratliff should never climb ladders, ropes or scaffolds. (R. at 421.) No manipulative, visual or communicative limitations were noted. (R. at 421-22.) He indicated that Ratliff

should avoid all exposure to hazards. (R. at 423.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on February 9, 2004. (R. at 425.)

On October 17, 2003, Hugh Tenison, Ph.D., a state agency psychologist, indicated that Ratliff suffered from a nonsevere anxiety-related disorder. (R. at 426-40.) Tenison also indicated that Ratliff had no restriction on his activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 436.) He also indicated that Ratliff had not experienced any episodes of decompensation. (R. at 436.) He reported that there was no evidence of a severe psychiatric impairment. (R. at 440.) This assessment was affirmed by state agency psychologist Leizer on February 11, 2004. (R. at 426.)

The record shows that Ratliff participated in two individual therapy sessions at Mount Rogers Community Counseling Services in 2004. (R. at 457-58.) On January 20, 2004, Wanda Fisher, L.C.S.W., reported that Ratliff was agitated. (R. at 458.) His affect and mood were reported as depressed and anxious. (R. at 458.) Ratliff reported sleep disturbance and crying spells. (R. at 458.) On February 10, 2004, Fisher reported that Ratliff's affect and mood were appropriate. (R. at 457.) Fisher reported that Ratliff discussed his medications and pain during the entire session. (R. at 457.)

On July 27, 2004, Belinda G. Overstreet, Ph.D., a licensed clinical psychologist, evaluated Ratliff at the request of Ratliff's attorney. (R. at 460-68.) Overstreet reported that Ratliff's attention, concentration and short-term memory were intact. (R. at 461.) His mood was anxious and depressed. (R. at 461.) The Minnesota

Multiphasic Personality Inventory-2, ("MMPI-2"), test was administered, and Overstreet reported that the profile should be interpreted with caution. (R. at 463.) She reported that there was some possibility that the report was an exaggerated picture of Ratliff's situation and problems. (R. at 463.) Overstreet reported that Ratliff could have been showing a lack of cooperation with the testing or could be malingering in an attempt to present a false claim of mental illness. (R. at 464.) Overstreet diagnosed a pain disorder associated with both psychological factors and a generalized medical condition, dysthymia overlaid with a history of a single major depressive episode, anxiety disorder, not otherwise specified, with features of a generalized anxiety disorder, a panic disorder and post-traumatic stress disorder. (R. at 467.) Overstreet indicated that Ratliff had a GAF score of 60. (R. at 467.)

Overstreet completed a mental assessment indicating that Ratliff had an unlimited ability to follow work rules, to maintain attention/concentration and to understand, remember and carry out simple instructions. (R. at 469-70.) She indicated that Ratliff had a limited, but satisfactory, ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to understand, remember and carry out complex and detailed instructions, to maintain personal appearance and to relate predictably in social situations. (R. at 469-70.) Overstreet indicated that Ratliff was seriously limited, but not precluded, in his ability to deal with work stresses, to function independently and to behave in an emotionally stable manner. (R. at 469-70.) She also indicated that Ratliff had a poor or no ability to demonstrate reliability. (R. at 470.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

By decision dated November 30, 2004, the ALJ denied Ratliff's claim. (R. at 18-24.) The ALJ found that the medical evidence established that Ratliff had severe impairments, namely a seizure disorder, hypertension and chronic neuritis of the intercostal nerves, but found that Ratliff did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Ratliff had the residual functional capacity to perform medium work that did not require climbing or hazardous work. (R. at 23.) Based on Ratliff's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Ratliff could perform jobs existing in significant numbers in the national economy, including those of an assembler and a

-15-

car cleaner. (R. at 23.) Therefore, the ALJ found that Ratliff was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. § 404.1520(g) (2006).

In his brief, Ratliff argues that the ALJ erred by finding that a significant number of jobs existed in the national economy that he could perform. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.) Ratliff also argues that the ALJ erred by rejecting Overstreet's opinion. (Plaintiff's Brief at 6-8.)

The ALJ found that Ratliff had the residual functional capacity to perform medium work that did not require climbing or hazardous work. (R. at 23.) Based on my review of the record, I find that substantial evidence exists to support this finding. Numerous diagnostic studies were normal, and clinical examinations have been within normal limits. (R. at 214, 216, 235, 241, 247-49, 290-93, 303, 349, 385.) In fact, Dr. Alvarado encouraged Ratliff to be physically and mentally active. (R. at 385, 446-47.) While Ratliff alleges residuals from the motor vehicle accidents that occurred in 1998 and 1999, he returned to work and performed heavy[12] exertion until the alleged onset date, thus, showing no significant residuals related to these injuries. (R. at 35, 58, 134.) Dr. Lipscomb released Ratliff to return to work on August 30, 1999, reporting that he could find no reason to justify Ratliff not being able to work. (R. at 303.) The state agency physicians found that Ratliff had the residual functional capacity to perform medium work that did not require him to climb ladders, ropes or scaffolds or expose him to hazards. (R. at 394-402, 418-25.)

---

[12]Heavy work involves lifting objects weighing no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

-16-

Case 1:05-cv-00084-PMS   Document 15   Filed 07/17/06   Page 16 of 18   Pageid#: 67

Based on my review of the evidence, I find that the ALJ properly rejected Overstreet's assessment. In his decision, the ALJ noted that Overstreet assessed Ratliff's GAF score at 60, indicating only mild symptoms or some difficulty in social, occupational or school functioning. (R. at 22.) He also noted that Overstreet found evidence of malingering and exaggeration of symptoms. (R. at 22.) He also found that if Overstreet's restrictions were found entirely credible, there was no evidence that showed they would last for any period of at least 12 continuous months. (R. at 22.) While Ratliff has been diagnosed with depression and anxiety, the medical evidence shows that these symptoms were controlled with medication. (R. at 356, 362-63, 366.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). The state agency psychologists reported that there was no evidence that Ratliff suffered from a severe psychiatric impairment. (R. at 403-17, 426-40.) Based on the above-stated reasons, I find that the ALJ did not err by rejecting Overstreet's assessment and by finding that Ratliff could perform medium work.

Based on my finding regarding Ratliff's residual functional capacity, I also find that substantial evidence exists to support the ALJ's finding that a significant number of jobs existed in the national economy that Ratliff could perform. The vocational expert identified jobs at the medium, light and sedentary levels that Ratliff could perform. (R. at 59-60.)

*IV. Conclusion*

For the foregoing reasons, Ratliff's motion for summary judgment will be

denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 17th day of July 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE